ESCO CORPORATION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (James Bullias, Appellee).

Fourth District (Industrial Commission Division)   No. 4—87—0394WC

Opinion filed April 28, 1988.

John C. Taylor, of Hendrix, Lierman & Taylor, of Champaign, for appellant.

Stephen M. Cornelius, of Scheele, Cornelius & Associates, Ltd., of La Grange, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Claimant James Bullias sought workers' compensation benefits following a heart attack which he suffered after playing 18 holes of golf, five months after he was discharged by his employer, Esco Corporation. An arbitrator awarded $306.67 per week for life as permanent total disability benefit, and found that the tension and stress caused by a demotion, termination, and other work-related events continued beyond the termination date. The Industrial Commission affirmed, finding that the work-related stresses and resulting coronary injury arose out of and in the course of employment. The circuit court of Vermilion County confirmed the Commission's decision. The

employer appeals, contending that the injury did not arise out of and in the course of the employment.

Claimant worked for Esco from April 18, 1950, to April 16, 1982. He acted as personnel manager for 26 years, and in January 1978 he was congratulated for his work and given a substantial raise. Several months later, in April 1978, claimant was informed by Arnie Wellman, the plant manager, that he was being replaced as director of industrial relations. Claimant testified that he experienced no cardiac problems before this date.

In September 1978, Edward Judice replaced claimant, who kept his title but reported to Judice. In December 1979, Judice spoke with claimant about his possible termination. Claimant testified that Judice said claimant would have to prove he was valuable and would have six months to hold down the cost of workers' compensation and control absenteeism. Judice agreed that he used the word "termination" in this conversation. Claimant felt shock and nervousness and began sending out resumes.

Judice testified that claimant asked him about the conversation several times, and that claimant worked under the assumption that he would be fired in May, despite assurances by Judice and Wellman that he would not be terminated. Judice observed that claimant had written "D-Day" on his calendar on May 31, 1980. Claimant continued to work past this date.

After 1981, the business went into a decline and a number of employees were terminated.

From May 1980 to January 1982, claimant's duties and responsibilities were reduced. Claimant became nervous and depressed. He took long car rides at night and watched television frequently. Wellman noticed no changes in claimant during this period.

On January 15, 1982, Judice and Wellman told claimant he was being transferred to the production control department as a production scheduler because there was not enough work in personnel. Several workers were ill in the production control department and someone was needed with a good knowledge of the plant. Claimant performed that job for three months. He felt unqualified, anxious, and nervous. His nervousness prevented his dentures from fitting, and he felt humiliated and embarrassed about his entire situation. He was often unable to sleep, sometimes vomited on the way to work, and considered suicide.

Wellman testified that claimant was subject to low periods, but that during this period his depression lasted longer than usual following the trauma of the move from personnel.

On April 8, 1982, Wellman suggested that the 56-year-old claimant retire early because the business was not doing well. Claimant requested a full pension. The employer had provided several employees with a full pension with an early retirement, although they had been with Esco for fewer years than claimant, but no employee under 60 years old had ever received a full pension. Claimant therefore refused to retire early. Wellman told him it would take several years to become competent in his present job.

On April 16, 1982, Wellman terminated claimant. Claimant testified that he was in complete shock, extremely depressed and upset. Wellman stated that severance checks in the amount of approximately $16,000 would be mailed to claimant so he could avoid the embarrassment of coming to the plant. Subsequently, however, Wellman asked claimant to come to the plant to obtain the checks. Claimant came and discovered the checks totalled only $14,000. After a lengthy discussion, claimant left, but forgot the checks. He telephoned Wellman, who told him the checks were being mailed to the Portland office, and that claimant would have to drop all suits against the employer if he wanted the checks. Wellman denied making these statements.

Wellman testified that workers were terminated on the basis of who was contributing the most at the time. He offered claimant early retirement, 31 weeks of severance pay, pay for that month, and vacation pay, which totalled about $17,000 or $18,000. Claimant refused the checks, stating they were not enough. Other offers, including a job in the bargaining unit at an hourly wage, were rejected by claimant.

Claimant became fatigued and nervous, and experienced minor chest pains after his termination. From April 16, 1982, to September 1982, claimant spoke with Wellman several times.

On September 9, 1982, after playing 18 holes of golf, claimant suffered a myocardial infarction at lunch. Dr. Fabrizio treated him, and diagnosed acute interior wall myocardial infarction.

Dr. Heatherington, the family physician, testified that he believed there was a causal connection between the work-related stress and the cardiac disease. Claimant's history showed no risk factors other than the stress at work. The record shows, however, that claimant's mother died of a heart attack at age 60 and that claimant's brother had suffered a slight heart attack. The record also indicated that a triple bypass was performed on claimant, which may indicate a long-term heart disease.

Dr. Heatherington testified further that he believed that the

adrenalin which people under stress release breaks down to catecholamines, which collect and block the arteries. He agreed with Dr. Fabrizio that generally it takes 10 to 15 years to develop coronary artery disease.

Dr. Robert King performed a coronary artery bypass surgery in June 1983. He testified that stress does cause an outpouring of adrenalin, which elevates blood pressure and cortisone, which makes the lining of the arteries more susceptible to damage. He believed this theory was generally accepted. Dr. King opined that the employment stress was the most pronounced risk factor in claimant's situation. He believed that the constriction of claimant's arteries progressed much faster than that of the general population because his self-image had been destroyed.

Dr. Robert McGann, a cardiologist, testified for the employer that the demotion and termination were only minor risk factors in the myocardial infarction. He could not completely rule out stress as a cause, but he believed claimant's family history and elevated cholesterol levels were the most important factors. Dr. McGann disagreed with Dr. King's theory regarding the adrenalin and cortisone.

In November 1982, the employer closed its manufacturing operation entirely due to the decline in business.

The Commission, with one member dissenting, found that a causal connection existed between the work-related stress and the heart attack. It relied on the testimony of claimant, Wellman, Judice, and Drs. Heatherington and King. The Commission found that the stresses "and the resulting coronary injury arose out of and in the course of employment [and] they were the result of economic reverses suffered by the company and actions necessary to combat these reverses." It concluded that the injury arose out of and in the course of the employment and affirmed the arbitrator's award.

The trial court found that the Commission was entitled to find causal connection based on the testimony of Drs. Heatherington and King. The court cautioned that as a matter of law there could be "no Worker's Compensation Award for mental or physical injury stemming solely from the termination of employment." The court distinguished this case, however, and found that the Commission could properly rely on "stress tied to a series of events as the relationship of [the parties] deteriorated over the final years of the latter's employment. This is not a case where a former employee develops problems after being discharged and seeks to recover from those problems."

The employer concedes that the record contains conflicting ex-

pert medical testimony on the factual issue of whether the work-related stress caused the coronary disease and does not argue that the Commission's finding of causal connection is against the manifest weight of the evidence. (See *City of Des Plaines v. Industrial Comm'n* (1983), 95 Ill. 2d 83, 447 N.E.2d 307.) Instead, the employer contends that the injury did not arise out of or in the course of the employment.

■■ ■ If there is work-related stress, either physical or emotional, that aggravates the disease so as to cause the heart attack, then there is an accidental injury arising out of and in the course of the employment. (*Doyle v. Industrial Comm'n* (1981), 86 Ill. 2d 544, 427 N.E.2d 1223.) Whether or not an injury occurs in the course of the employment depends upon the time, place and circumstances under which the accident occurred. (*Orsini v. Industrial Comm'n* (1987), 117 Ill. 2d 38, 509 N.E.2d 1005.) The majority of the stress which claimant points to occurred while he was employed. Claimant also cites a few conversations subsequent to his termination which made him anxious or upset. Compensation has been awarded for heart attacks suffered after the employee left his work. In *Doyle v. Industrial Comm'n*, the employee suffered a myocardial infarction several hours after a stressful time at work.

■ In the present case, the myocardial infarction occurred five months after claimant was terminated. The term "employment" includes a reasonable time before or after actual employment. (*Brooks v. Carter* (1981), 102 Ill. App. 3d 635, 430 N.E.2d 566.) We find that a heart attack occurring five months after termination of employment falls outside a period of reasonable time after the actual employment ended so as to permit an award of benefits. The Commission erred in finding the injury occurred in the course of employment.

Claimant cites *Illinois Valley Irrigation, Inc. v. Industrial Comm'n* (1977), 66 Ill. 2d 234, 362 N.E.2d 339, and reports that the employee in that case died one month after he stopped working. However, there the employee experienced medical difficulties while performing heavy physical labor on his job, suffered some type of coronary failure that night at home, and was admitted to the intensive care unit. Following his release, the employee worked part-time in the office, but performed no physical duties in his employment. One month after the first attack, the employee died suddenly while announcing a little league baseball game. The award was upheld. The present case is entirely different. The element of physical labor is not involved; no coronary failure occurred while claimant was still em-

ployed; no hospitalization or medical care resulted in a diagnosis of claimant's condition when he was terminated; and claimant never returned to work in a different position. Claimant's reliance on this case is misplaced.

■■ ■ The second element of a workers' compensation claim, whether or not an injury arises out of the employment, requires proof that the injury has its origin in some risk so connected with or incidental to the employment as to create a causal connection between the employment and the injury (*Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 509 N.E.2d 1005). The risk of injury must be peculiar to the work such that the employee is exposed to it to a greater degree than the general public by reason of the employment. A risk is incidental to the employment when it was connected with what the employee has to do in fulfilling his duties. An injury would not be compensable if it was the result of a risk personal to the employee or resulted from a hazard to which the employee would have been equally exposed apart from the employment. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 509 N.E.2d 1005.

In recent years there have been numerous cases addressing the issue of whether emotional stress can cause a compensable disability. (See generally 1B A. Larson, The Law of Workmen's Compensation §§38.65, 42.20 through 42.25(g) (1988).) The protracted burdening of employees with worry, frustration, tension or apprehension is a comparatively new and quickly growing area of compensation law. (See generally 1B A. Larson, The Law of Workmen's Compensation §38.65(b), at 7—221; §42.20, at 7—585 (1988).) One factor focused upon is whether the worker was subjected to greater emotional strain than that to which all workers are occasionally subjected.

■■ ■ Here, we find that, as a matter of law, claimant's disability is not compensable because his myocardial infarction constituted a subjective reaction to normal working conditions. The standard defining what is normal or usual permits comparison to the usual stress in employment generally for all workers, or to the usual stress in claimant's particular job. The stress here was not unusual when compared with the stress found in employment life generally. Claimant found himself in a situation which had no greater dimensions than the situations which all employees potentially face, causing mental stresses and tensions. (See, *e.g., School District No. 1, Village of Brown Deer v. Department of Industry, Labor & Human Relations* (1974), 62 Wis. 2d 370, 215 N.W.2d 373.) All workers face the possible loss of employment triggered by an economic decline. This is a normal working condition. (See, *e.g., Evans v. Workmen's Compensation Appeal*

*Board* (1985), 87 Pa. Commw. 436, 487 A.2d 477 (where no award for stress-related psychiatric disorder following unfounded fear of losing job because it did not result from something other than normal working conditions). See also *Kelly's Case* (1984), 17 Mass. App. 727, 462 N.E.2d 348, *aff'd* (1985), 394 Mass. 684, 477 N.E.2d 582 (awarded benefits where employee had emotional breakdown when employee laid off after 22 years in the department, and then transferred to a different department).) After *Kelly's Case*, the Massachusetts legislature enacted a provision under which a mental disability arising out of a *bona fide* personnel action, including transfer, demotion or termination, is not compensable absent intentional infliction of emotional harm. (Mass. Ann. Laws ch. 152, §29 (Law. Co-op. 1985).) Transfers, demotions, new responsibilities, and layoffs or terminations are normal and expected conditions of employment life, along with the accompanying insecurity and worry. The stress stemming from the fear of losing a job was not sufficiently greater than that faced by all workers so as to make the heart attack compensable. See, *e.g.*, *King v. Wilson Brothers Drilling Co.* (La. App. 1983), 441 So. 2d 68.

■ Furthermore, there was no unusual amount of stress when compared with the employee's normal stress experienced while performing his duties. In the present case, the employment itself imposed no additional or unusual stresses on claimant. He was not, for example, asked to do more physically or intellectually exhausting work. The stress was directly referable, not to employment duties, but to the inevitable transfers, demotions and terminations which are necessarily attendant to economic declines in a business, and which frequently occur during the several years just prior to a manufacturer's shutdown.

■ In Illinois, compensation has been awarded for emotional stress which triggers a heart attack. (*Sears, Roebuck & Co. v. Industrial Comm'n* (1980), 79 Ill. 2d 59, 402 N.E.2d 231 (stress of preparing to participate in employer-sponsored alcoholism treatment program); *County of Cook v. Industrial Comm'n* (1977), 69 Ill. 2d 10, 370 N.E.2d 520 (stress of working in a tax-collection office during the final week for paying taxes); *Wirth v. Industrial Comm'n* (1974), 57 Ill. 2d 475, 312 N.E.2d 593 (stress of handling company's affairs during bankruptcy).) Compensation is denied, however, where the employee's disability is brought on under stress no greater than that which would be expected by the general public. (*Doyle v. Industrial Comm'n*, 86 Ill. 2d 544, 427 N.E.2d 1223; *Stewart Warner, Datafax Corp. v. Industrial Comm'n* (1979), 76 Ill. 2d 464, 394 N.E.2d 397.)

As we have discussed, claimant here was exposed to stress equal to that which all workers face. There is insufficient evidence to support a finding that the employer's treatment of claimant brought on any stress which exceeded that imposed upon workers generally. The Commission erred in finding the disability arose out of the employment.

Claimant relies upon *Sears, Roebuck & Co. v. Industrial Comm'n*, where the employee suffered a heart attack as the result of the emotional stress of preparing to participate in an employer-sponsored alcohol rehabilitation program. (The legislature later amended the Act so as to deny coverage for injuries incurred while participating in such a program (Ill. Rev. Stat. 1985, ch. 48, par. 138.11).) The court in *Sears* held that the rehabilitation program and related interview with his employer combined to cause sufficiently unusual stress to permit the Commission to find it was a greater risk than that to which the general public is exposed. In the present case, we are not faced with an employer providing a rehabilitation program for a serious disease which necessarily provokes anxiety and stress. Moreover, *Sears* did not involve a five-month interval between the allegedly stressful event and the heart attack. Instead, the myocardial infarction occurred minutes before the employee was to meet with his therapist and supervisor.

For the foregoing reasons, the judgment of the circuit court of Vermilion County confirming the decision of the Industrial Commission is reversed.

Reversed.

BARRY, P.J., and WOODWARD, McCULLOUGH, and CALVO, JJ., concur.