ANNA MARIE EFREMIDIS, Widow of Dimitrius Efremidis, Deceased, Appellant, v. THE INDUSTRIAL COMMISSION *et al*. (R.G. Construction Services, Inc., Appellee).

First District (Industrial Commission Division)   No. 1—98—1347WC

Opinion filed October 18, 1999.

Richard E. Aleksy and Molly C. Mason, both of Law Offices of Corti & Aleksy, of Chicago, for appellant.

Matthew B. Schiff, James W. Hulbert, and Bridget A. Neuson, all of Schiff & Hulbert, of Chicago, for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

Claimant Anna Marie Efremidis, widow of Dimitrius Efremidis, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1996)), alleging that her husband suffered a fatal heart attack that arose out of and in the course of his employment with employer R.G. Construction Services, Inc. The arbitrator awarded death benefits pursuant to section 7 of the Act (820 ILCS 305/7 (West 1998)). The Industrial Commission (Commission) reversed, holding that decedent's heart attack did not arise from his employment. The trial court confirmed the Commission's decision, and this appeal followed. Because we find the manifest weight of the evidence supports the finding that decedent's heart attack did not arise from his employment, we affirm.

## I. Facts

Decedent was a construction laborer for employer. When decedent

died, he was 47 years old, was five feet tall, and weighed 156 pounds. Decedent smoked cigarettes regularly and drank occasionally. Although he was advised to stop smoking and drinking due to hypertension and chest pains, he failed to follow this advice. He also quit taking the prescribed medications for these conditions because of side effects.

The weekend before decedent's death was the Labor Day holiday, which he and claimant spent vacationing. Claimant testified that decedent was not ill over the weekend. The following Tuesday morning, September 7, 1993, claimant and decedent awoke at approximately 4:15 a.m. and drank some coffee before decedent left for work at 4:45 a.m. Claimant prepared a lunch for decedent consisting of a sandwich, cookies, fruit juice, and water. Claimant testified that decedent was happy and talkative and did not appear sick.

At work that day, decedent and his coworker, Antonio Rosales, began a new project for employer involving the installation of a synthetic plaster system on the exterior of a new retail store. Both were responsible for transporting and setting up scaffolding along one side of the new building.

Rosales testified that when he arrived at employer's facility at approximately 6:30 a.m., decedent was there waiting for him. Soon after, he and decedent began loading the scaffolding equipment onto a truck with a flatbed measuring 8 feet by 14 feet. Rosales estimated that it took them 1 1/2 to 2 hours to load forty to fifty 45-pound scaffold frames; sixty 12-pound cross-braces; twenty-five to thirty 15-pound screw jacks; sixty to seventy 16-foot wood planks measuring 2 inches by 10 inches; and several 30-pound rolls of black paper. With the aid of decedent's direction, Rosales loaded most of the materials by forklift. Decedent also placed wooden blocks between the equipment as spacers.

After driving to the work site, decedent and Rosales spent about 20 minutes clearing small stones from where the scaffold was to be assembled. After Rosales laid black paper on the ground, Rosales and decedent unloaded the screw jacks and placed them in seven-foot intervals. When they unloaded the scaffolding frames from the truck, decedent stood on the truck's flatbed and brought the equipment to the rear of the truck where he handed it to Rosales on the ground. Rosales then carried the pieces to the building for assembly. Because the scaffolding was to stretch for approximately 70 to 80 feet, decedent had about two to three minutes to rest between each handoff. Decedent left the truck to help carry the planks and the 12-pound cross-braces to the scaffolding frames. When unloading the planks, each carried one at a time, and when unloading the braces, each carried four or five at a time. Decedent also assisted Rosales in attaching the cross-braces to the frames.

By 12 noon, the first level of the scaffolding was assembled, and Rosales and decedent broke for a half-hour lunch. When they resumed work at 12:30 p.m., decedent remained on the flatbed to hand the scaffolding equipment to Rosales, who, by that time, was working on top of the first level of the assembled scaffolding, approximately 7½ feet above the ground. For Rosales to reach the truck, they placed a plank between the scaffolding and the truck's flatbed. Similar to before, decedent brought the scaffolding equipment from the front of the truck to the rear. Only instead of handing the materials down to Rosales, decedent had to lift the materials a few feet above the flatbed, as the flatbed was 3½ feet lower than the first level of scaffolding. Rosales carried and assembled the framing. As with the first-level assembly, decedent had a few minutes to rest between each handoff due to the time it took Rosales to traverse the length of the scaffolding and assemble the parts. This continued for about a half-hour.

At approximately 1 p.m., decedent placed the frame he was carrying down on the bed of the truck, tried to balance himself on the frames remaining behind him, and slowly fell backward. Rosales called to decedent and went to massage him in an attempt to wake him. Rosales testified that decedent looked yellowish and pale and that he felt hot but not sweaty. Receiving no response, Rosales quickly found others to call an ambulance. All attempts to revive decedent by the paramedics and the physician in the emergency room failed.

Rosales testified that the temperature that day ranged between 70 and 75 degrees Fahrenheit while the paramedics recorded the temperature at 64 degrees Fahrenheit. Even though Rosales described their work that day as lighter than usual, he also testified that it made them feel hot.

The Cook County coroner performed an autopsy and determined decedent's death was caused by coronary atherosclerosis. The coroner found diffuse atherosclerosis with focal areas of 80% narrowing in both the anterior descending branch and circumflex branch of the left coronary artery. Likewise, the coroner found generalized atherosclerosis with focal areas of 70% narrowing in the right coronary artery. The coroner also noted that the myocardium had an area of fibrosis consistent with a remote myocardial infarction (heart attack) in the posterolateral wall of the left ventricle.

Dr. Nathaniel Greenberg testified by deposition on behalf of claimant. Dr. Greenberg's practice focuses on the diagnosis of patients with cardiovascular disease. He has also testified in matters involving the treatment and diagnosis of cardiovascular disease. Although he is board certified in internal medicine, he is not certified in cardiovascular disease nor is he board certified in critical care medicine.

Dr. Greenberg opined that, based upon a reasonable degree of medical certainty, decedent suffered from a fatal heart rhythm disturbance called ventricular fibrillation and that the work activity in which decedent was engaged on the day of the attack was a precipitating cause. He anchored his opinion on the fact that decedent did not exhibit any outward manifestation of coronary disease or heart trouble prior to his sudden death. He also considered that decedent smoked, had elevated blood pressure, had a normal cholesterol in 1976, and had suffered from a myocardial infarction sometime prior to 1979, as shown by an electrocardiogram (EKG) taken from decedent that year. Dr. Greenberg concluded that the coroner's finding of advanced coronary atherosclerosis in all the major coronary arteries as well as the remote myocardial infarction evidenced by an area of fibrosis in the left ventricle were consistent with the 1979 EKG.

Dr. Greenberg combined all this information to explain his theory of what caused decedent's heart attack. He opined that, where the heart is handicapped by an old infarct and advanced coronary artery disease, the heart will not receive an adequate blood supply when a substantial workload is imposed on it and the resultant lack of adequate oxygen and other nutrients causes the heart muscle to accumulate abnormal amounts of metabolites, such as lactic acid and potassium. This excess accumulation of metabolites creates a state of excessive cardiac irritability. This is superimposed on the already increased irritability of the heart muscle caused by the old infarct and the significant coronary artery disease. When all of these factors are combined, Dr. Greenberg believed they were more than sufficient to have precipitated the ventricular fibrillation that caused decedent's death.

Dr. Greenberg further opined that ordinary activity was obviously insufficient to have caused decedent's death, noting from claimant's testimony that decedent danced over the weekend and engaged in intercourse without suffering from a fatal arrhythmia. Rather, he asserted that "the activity that we know about on the day he died, which we know was sufficient to overtax a diseased heart, clearly resulted in his sudden death."

On cross-examination, Dr. Greenberg stated that he considered decedent's repetitive lifting and handing of the scaffolding parts to Rosales to be heavy work and that a failure to sweat could be a sign of a substantial strain on one's metabolism. However, he admitted that the electrical instability created by the presence of the fibrosis of the left ventricle could provoke a fatal arrhythmia without external provocation. He further admitted that smoking cigarettes can precipitate an arrhythmia and that the metabolites in decedent's body would have diminished during his lunch break.

Dr. Dan J. Fintel testified by deposition on behalf of employer. Dr. Fintel has served as a clinical and research fellow in cardiology and cardiovascular diseases at the Johns Hopkins Medical Institutions. He holds board certifications in internal medicine, cardiovascular diseases, and critical care medicine. He also serves as the director of the coronary care unit at Northwestern Memorial Hospital, has an active clinical practice, and treats patients with cardiac arrhythmias on a daily basis. Furthermore, he has authored numerous materials on cardiology.

Dr. Fintel opined that there was no causal connection between the onset of decedent's fatal arrhythmia and the work he was performing. Dr. Fintel explained that the fibrosis section of decedent's heart, which was caused by a remote myocardial infarction, created the conditions for an abnormal passage of electrical activity through the heart muscle and that this provided the substrate or conditions for a life-threatening arrhythmia. Couple this with decedent's severe coronary artery disease in all of his coronary arteries and Dr. Fintel believed that decedent was at a substantially increased risk of suffering a life-threatening arrhythmia with any activity, whether it be resting, walking, or working. In forming his opinion, he also considered decedent's risk factors, including his sex, his history of high blood pressure and hypertension, and his smoking habit. He also noted that decedent failed to take his medicine for hypertension.

Dr. Fintel continued by observing that the decedent's work was not strenuous activity but, rather, was fairly mild, consisting of brief movement, lifting, and handing off items not more that 50 pounds. Specifically, Dr. Fintel noted decedent was standing in a truck, lifting objects weighing between 12 and 48 pounds, and moving them from one end of the flatbed to the other, a span of no more than 12 feet, where he handed them to Rosales. He noticed there was no evidence that decedent was exposed to extreme temperature conditions, which are often involved in cases of sudden cardiac death. It was Dr. Fintel's opinion that decedent's failure to sweat supports this conclusion as well as suggests he was not engaged in steady aerobic activity.

Lastly, Dr. Fintel disagreed with Dr. Greenberg's build-up-of-metabolites theory, noting, as stated above, that decedent's activities were not aerobically significant and not substantially different than normal everyday activities. Dr. Fintel concluded that, with a patient in decedent's medical condition, "sudden death is an accident waiting to happen" and that the work decedent performed on the day of his death played no more of a role in causing the fatal arrhythmia than any activities he had done before.

## II. Discussion

Claimant contends that decedent's work was a precipitating cause of his heart attack and that the Commission's decision to the contrary is against the manifest weight of the evidence. Claimant argues that the facts in this case are essentially undisputed and that we should reverse the Commission's decision as a matter of law. We disagree.

■ To recover workers' compensation benefits, a claimant must prove that the work-related injury arose out of and in the course of his employment. 820 ILCS 305/2 (West 1998); *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 57 (1989). "The phrase 'in the course of' refers to the time, place and circumstances under which the accident occurred." *Caterpillar Tractor Co.*, 129 Ill. 2d at 57. Because decedent died while at work, there is no dispute as to this element. Rather, our focus is on whether decedent's heart attack arose from his employment.

■ Two different inquires have been used to make this determination. An injury arises out of the employment where it originates from a risk connected with, or incidental to, the employment so as to establish a causal connection between the injury and the employment. *Caterpillar Tractor Co.*, 129 Ill. 2d at 58; *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 45 (1987). "A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties." *Caterpillar Tractor Co.*, 129 Ill. 2d at 58; accord *Orsini*, 117 Ill. 2d at 45. An injury originating from a risk common to the general public also arises out of the employment if the employee is exposed to it to a greater degree through his work. *Caterpillar Tractor Co.*, 129 Ill. 2d at 58; *Orsini*, 117 Ill. 2d at 45. Under either inquiry, however, an injury does not arise out of the employment if it was caused by some hazard to which the employee would have been equally exposed notwithstanding his employment. *Caterpillar Tractor Co.*, 129 Ill. 2d at 59; *Orsini*, 117 Ill. 2d at 45; *Hammel v. Industrial Comm'n*, 253 Ill. App. 3d 900, 902 (1993); *Esco Corp. v. Industrial Comm'n*, 169 Ill. App. 3d 376, 383 (1988). Consequently, for a heart attack to arise out of one's employment, the work must create a higher degree of physical or emotional stress as compared to stress attendant to normal daily activities. *Flynn v. Industrial Comm'n*, 302 Ill. App. 3d 695, 702 (1998); *Esco Corp.*, 169 Ill. App. 3d at 383; *Vesco Ventilation & Equipment Sales v. Industrial Comm'n*, 168 Ill. App. 3d 959, 965 (1988); *Northern Illinois Gas Co. v. Industrial Comm'n*, 148 Ill. App. 3d 48, 53 (1986).

While claimant must prove that some act of employment was a causative factor to establish that the heart attack arose out of decedent's employment, claimant need not show that it was the sole

or even the principal causative factor. *Ingersoll Milling Machine Co. v. Industrial Comm'n*, 253 Ill. App. 3d 462, 469 (1993). To that end, a preexisting heart condition does not necessarily preclude compensation where the Commission "may legitimately infer from the evidence that the employee's work duties were a causative factor in the heart attack." *Vesco Ventilation & Equipment Sales*, 168 Ill. App. 3d at 964.

■ As a general rule, determination of whether decedent's heart attack arose out his employment is an issue of fact. *Wheelan Funeral Home v. Industrial Comm'n*, 208 Ill. App. 3d 832, 836 (1991). It is well settled that it is the province of the Commission "to determine the facts and draw reasonable inferences from competent evidence." *Wheelan Funeral Home*, 208 Ill. App. 3d at 836. Likewise, it is the Commission's function "to decide disputed questions of fact, including those of causation, and to resolve conflicting medical opinions." *Vesco Ventilation & Equipment Sales*, 168 Ill. App. 3d at 965. Accordingly, we will not disregard permissible inferences drawn by the Commission on the basis that different or conflicting inferences may also be drawn from the same facts nor will we substitute our judgment for that of the Commission unless its findings are against the manifest weight of the evidence. *Martin v. Industrial Comm'n*, 227 Ill. App. 3d 217, 219 (1992). For a " 'finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent' " (*Drogos v. Village of Bensenville*, 100 Ill. App. 3d 48, 54 (1981), quoting *In re Application of County Collector*, 59 Ill. App. 3d 494, 499 (1978)); thus, a reviewing court only determines whether sufficient evidence exists to support the Commission's decision. *Cassens Transport Co. v. Industrial Comm'n*, 262 Ill. App. 3d 324, 331 (1994).

■ In the instant case, the outcome-determinative factor was the Commission's decision to follow Dr. Fintel's opinion on causation rather than Dr. Greenberg's. Dr. Greenberg opined that decedent's fatal ventricle fibrillation was precipitated by his work. He explained that a number of factors together with decedent's exertion during work caused the onset of decedent's arrhythmia that led to his fatal ventricle fibrillation. He observed that decedent's heart was handicapped by not only very advanced coronary atherosclerosis in the major coronary arteries, but also by the presence of a fibrosis patch or scar tissue present in the left ventricle, which was caused by an infarction dating sometime prior to 1979. These conditions provided a foundation of cardiac instability. This irritability in combination with decedent's exertion at work caused excessive metabolites to accumulate in the cardiac tissue also causing more irritability. Considering all these facts together, Dr. Greenberg believed that they were more than sufficient to have precipitated the ventricular fibrillation causing decedent's death.

Dr. Greenberg also opined that ordinary activity was obviously not sufficient to have caused decedent's death, noting that decedent danced over the weekend and engaged in intercourse without suffering from a fatal arrhythmia. Rather, he claimed that "the activity that we know about on the day he died, which we know was sufficient to overtax a diseased heart, clearly resulted in his sudden death."

Nevertheless, the Commission was not bound to accept Dr. Greenberg's excessive-metabolites theory. Nor was it bound to accept his *post hoc* reasoning that, because the heart attack occurred during work, the work must have caused the heart attack. Instead, the Commission followed Dr. Fintel's opinion, citing him as being more credible than Dr. Greenberg. See *Vesco Ventilation & Equipment Sales*, 168 Ill. App. 3d at 965. The Commission noted that Dr. Fintel was certified not only in internal medicine, like Dr. Greenberg, but he was further certified in cardiovascular diseases and critical care. The Commission considered that Dr. Fintel serves as the director of the coronary care unit at Northwestern Memorial Hospital, has an active clinical practice, treats patients with cardiac arrhythmias on a daily basis, and has been published on the topic numerous times.

Dr. Fintel opined that there was no causal connection between the onset of decedent's fatal arrhythmia and ventricle fibrillation. In short, he believed decedent's severe coronary artery disease together with the already existing damage to his heart from a prior heart attack increased his risk of suffering a fatal arrhythmia while performing any activity, whether it be working or simply resting. He also noted that decedent had a number of known risk factors, such as being a male, having high blood pressure and hypertension, and smoking cigarettes.

Moreover, unlike Dr. Greenberg, Dr. Fintel did not categorize decedent's work as strenuous activity, but perceived it as being fairly mild, consisting of brief movement, lifting, and passing items not more than 50 pounds. He noted that decedent had two to three minutes to rest between each task and that he was not exposed to extreme temperature conditions. Dr. Fintel felt that decedent's failure to sweat confirmed that he was not engaged in steady aerobic activity. Dr. Fintel also repeatedly compared the exertion level of treadmill walking to decedent's work activities and concluded that the work activities were not more demanding than normal daily activities in which the general public participates. Consequently, Dr. Fintel disagreed with Dr. Greenberg's opinion that strenuous activity caused an excessive amount of metabolites to build up in decedent's heart to such an extent as to trigger his fatal heart attack. He instead concluded that the condition of decedent's heart made cardiac sudden death "an accident waiting to

happen." This expert testimony together with the other evidence in the record more than supports the Commission's decision that decedent's work did not create a higher degree of physical stress as compared to stress attendant to normal daily activities. Consequently, the Commission's decision denying death benefits is supported by the manifest weight of the evidence.

Claimant, however, makes numerous contentions in an attempt to undercut the Commission's determination. Specifically, she contends that: Dr. Fintel was not qualified to render an opinion that decedent's work activities as described by Rosales could not be a causative factor in his death; the Commission believed it *must* give more credence to Dr. Fintel because he is a cardiologist; this court and the Commission have upheld awards with facts similar to those in this case; and she is somehow entitled to recovery under a "chain of events" analysis even though the autopsy revealed decedent's advanced heart disease. Having found these contentions meritless in light of applicable authority, we reject them without discussion.

### III. Conclusion

For the reasons discussed above, we affirm the circuit court's confirmation of the Commission's decision.

Affirmed.

McCULLOUGH, P.J., and COLWELL, HOLDRIDGE, and RARICK, JJ., concur.