Industrial Commission Division

 December 31, 1998

No. 1-97-1586WC

JANE E. FLYNN, ) Appeal from

) the Circuit Court

Appellant, ) of Cook County.

)

v. )

) 

INDUSTRIAL COMMISSION 
et al. 
)

(Takata/Gateway, Inc., ) Honorable

) John A. Ward,

Respondent-Appellee). ) Judge Presiding.

JUSTICE RAKOWSKI delivered the opinion of the court:

Claimant, Jane E. Flynn, filed an application for adjustment before the Industrial Commission (Commission) pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 
et seq.
 (West 1996)), seeking death benefits from Takata/Gateway, Inc. (employer) for the death of her husband, Jackson Flynn (decedent)
.  Decedent died as a result of an extensive myocardial infarction, or heart attack.  Claimant argued that prolonged, chronic stress related to decedent's work was a causative factor of decedent's heart attack.  The arbitrator found that claimant's heart attack arose out of and in the course of his employment.  However, on review, the Commission reversed the arbitrator's decision, finding that the heart attack did not arise out of and in the course of his employment.  Claimant appealed to the circuit court, which confirmed the Commission's decision.  We have jurisdiction pursuant to Supreme Court Rule 301, allowing appeals from final judgments.  155 Ill. 2d R. 301.  For the following reasons, we affirm.  

FACTS

Employer manufacturers seat belts for automotive companies.  Decedent was vice president of Material Control and Data Processing when he died from a heart attack on July 30, 1989.  Decedent was 55 years old.

There was no evidence before decedent's death that unequivocally showed he suffered from coronary heart disease.  In 1984, decedent underwent a treadmill stress test the results of which were not entirely normal partly because decedent never reached his target heart rate.  In 1988, decedent was approximately six feet, four inches tall and weighed approximately 261 pounds; his cholesterol level was 146.  Decedent's blood pressure was within normal range at 120 over 80.  At the time of death, he was not taking any medications other than two aspirins daily.  He did not smoke and drank alcohol occasionally.  The only known factors that could have contributed to coronary heart disease in decedent's case were that decedent’s father died from a myocardial infarction at age 55 and that decedent was moderately obese.     

Four months prior to death, decedent was subjected to a 
number of stressful circumstances of both a personal and work-

related nature.  In December 1988, decedent's pregnant daughter was diagnosed with Hodgkin's disease.  The doctors were unable to treat the disease until after she gave birth.  To lend support, claimant frequently visited their daughter in Alabama during the week and returned home for the weekends.  In addition to decedent's daughter being ill, claimant was diagnosed with breast cancer in May 1989 and underwent a mastectomy soon after.  Decedent's co-workers testified that decedent was very concerned about his daughter and claimant's health during this time period.

At work, decedent was also subjected to stressful situations.  In April and March 1989, employer, known as Gateway at that time, was being bought by Takata, Inc.  Because Takata neither terminated the staff nor extended employment contracts to them, decedent was concerned about his job security.

   Decedent was also facing the busiest period of the year for employer.  Each year when the automobile companies introduced new models, employer had to re-tool and redesign its seat belt components to satisfy the new automobile models.  This period, stretching from June to August, was called the "launch period" or "change over."  Because this time of year was so busy, vacations were frowned upon and discouraged.  However, testimony showed that this year was not any busier than past years; rather, it was actually one of the easier launch periods employer had seen.  Nevertheless, decedent’s job during this period was demanding.  He was not only responsible for ensuring that the components reached employer's factories on time for assembly, but he was also responsible for ensuring that the purchasers received the employer's product on time.  However, decedent was not under any specific deadline or involved with any specific project other than launching the new product line as he did in previous years.    Theodore Cunningham, decedent's assistant, testified that the computer system was antiquated and insufficient and that it crashed three times during the 1989 launch period causing delays.  Other testimony from Frank Frick, former president of the company, and Alan Kromer, chief financial officer, asserted that the computer was sufficient for decedent’s purposes, although inadequate for the accounting department.  According to Kromer, decedent never complained that the computer system prevented him from doing his job.  

Cunningham also intimated that decedent was held responsible for other department's delays and mistakes that would ultimately affect his department's schedule.  Nonetheless, other testimony established that decedent was not a "lightening rod" for the company's problems and that he was not held responsible for situations out of his control.

Although claimant and Cunningham testified that decedent worked longer hours during the launch period, other testimony established that decedent worked no more than his usual 8 a.m. to 5-5:15 p.m. day.  Decedent also worked three or four hours on three out of four Saturdays per month, as he did throughout his career.  Saturdays were days in which employees would clean their desk, update filing, or perform general administrative tasks.  They were not typical work days.

Claimant and Cunningham also recalled that decedent appeared tired during the 1989 launch period, although others testified that decedent appeared normal.  According to claimant, decedent talked about work more than ever and that he was trying hard so the company would look good to the new owners.  In February 1989, decedent quit taking lunch time walks with Frank Frick, and he quit walking with claimant.  Claimant also noted that he seemed to be gaining weight during the launch period.

The day before decedent died, Saturday July 29, 1989, decedent went to the office as usual and returned home early in the afternoon.  No evidence suggests that decedent performed any unusual task.  

The next day, decedent and claimant went to mass at 7 a.m.  After mass, decedent did not feel well and was perspiring profusely.  Decedent requested that claimant drive, at which time claimant took decedent to the hospital.  Decedent also told claimant at that time that he had chest pains on Saturday morning while at work.  

An electrocardiogram performed at the hospital indicated an extensive myocardial infarction.  As a result, a sizable portion of the anterior wall of decedent's heart was deprived of oxygenated blood.  Within 45 minutes of his arrival, decedent went into cardiac arrest and could not be resuscitated.  

Dr. Nathaniel Greenberg, board certified in internal medicine, testified on claimant's behalf.  Through deductive reasoning, Dr. Greenberg concluded that the prolonged, chronic stress that decedent was subjected to at work accelerated atherosclerotic hardening of the coronary arteries leading to decedent’s death.  Dr. Greenberg ruled out obesity as a risk factor since decedent's weight of 261 pounds did not make him overly obese, and he also eliminated a high cholesterol level as a risk factor based upon the 1988 results of a level of 146.  Furthermore, decedent did not smoke, he did not suffer from hypertension, nor did he have diabetes.  Although he acknowledged that decedent’s father’s death due to coronary heart disease was an important factor and that genetics play an important role, he still believed that decedent’s stressful work was a factor in his death.  However, in making his deductive conclusion, Dr. Greenberg failed to consider that decedent's daughter was diagnosed with Hodgkin’s disease or that claimant was diagnosed with and treated for breast cancer.  On cross-examination, he conceded that, although acute stress has been identified as a causative factor of myocardial infarctions, prolonged, chronic stress has only recently been gaining acceptance as a causative factor.  

Dr. Gerry A. Smythe, board certified in cardiology and internal medicine, testified for respondent and disagreed with Dr. Greenberg’s assessment.  Initially, Dr. Smythe noted that the treadmill stress test performed upon decedent in 1984 was not entirely normal.  He believed that the test's reliability was undercut because decedent never reached his target heart rate.  Furthermore, in 1985 when decedent had an appendectomy, an electrocardiogram showed some defects that could have been signs of coronary artery disease.  

While acknowledging that acute stresses have been shown to cause some types of myocardial infarctions and that such stress may be a risk factor, Dr. Smythe disagreed with Dr. Greenberg’s opinion that prolonged, chronic stress can be a causative factor of myocardial infarctions.  According to Dr. Smythe, prolonged, chronic stress has never been linked to causing myocardial infarctions and heart attacks.  He explained that an acute stressor, a stressor that inflicts emotional or physical strain over a short period of time, can be a causative factor for certain types of myocardial infarctions.  For example, if only a trickle of blood is passing through a coronary artery and the person becomes emotionally excited or performs a stressful physical act, this could cut off or overly decrease the supply of blood and nourishment to the cardiac muscle to cause a myocardial infarction.  On the other hand, Dr. Smythe asserted that he knew of no study that has established a definite relationship between prolonged, chronic stress and myocardial infarctions.  He further opined that the stress decedent was subjected to prior to his death was not out of the ordinary when compared to decedent’s work habits spanning his career and that this routine would not be a factor in causing coronary heart disease.  

Dr. Smythe specifically noted in his report that Dr. Greenberg failed to consider the stressors of decedent’s daughter and wife contracting potentially fatal diseases within a very short period of time.  According to Dr. Smythe, these stressors occurring within a short period of time have a greater impact on a person than any job situation.  He also opined that other factors existed in decedent's case that are absolutely certain to contribute to coronary artery disease.  Noting that decedent was mildly obese, Dr. Smythe asserted that obesity plays a part in the promotion of coronary disease.  The most important factor, however, is family history.  According to Dr. Smythe, that decedent’s father died of a myocardial infarction at age 55 was a strong indicator that decedent had a predisposition for developing coronary artery disease.  

ANALYSIS

Claimant contends that the Commission erred by failing to find that decedent’s heart attack arose out of and in the course of his employment.  Specifically, claimant argues that prolonged, chronic stress directly related to work accelerated decedent's coronary heart disease and, therefore, contributed to his death.   Determination of whether an injury arose out of and in the course of employment is an issue of fact.  
Wheelan Funeral Home v. Industrial Comm'n
, 208 Ill. App. 3d 832, 836 (1991).  It is the province of the Commission "to determine the facts and draw reasonable inferences from competent evidence."  
Wheelan Funeral Home
, 208 Ill. App. 3d at 836.  Thus, it is the Commission's function "to decide disputed questions of fact, including those of causation, and to resolve conflicting medical opinions."  
Vesco Ventilation & Equipment Sales v. Industrial Comm'n
, 168 Ill. App. 3d 959, 965 (1988).  We will not disregard permissible inferences drawn by the Commission on the basis that different or conflicting inferences may also be drawn from the same facts nor will we substitute our judgment for that of the Commission's unless its findings are against the manifest weight of the evidence.  
Martin v. Industrial Comm’n
, 227 Ill. App. 3d 217, 219 (1992).  For a " 'finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent.' " 
Drogos v. Village of Bensenville
, 100 Ill. App. 3d 48, 54 (1981), quoting 
In re Application of County Collector
, 59 Ill. App. 3d 494, 499 (1978).  Accordingly, a reviewing court only determines whether sufficient evidence exists to support the Commission's decision.  
Cassens Transport Co. v. Industrial Comm’n
, 262 Ill. App. 3d 324, 331 (1994).

Claimant bears the burden of establishing that decedent's heart attack arose out of and in the course of his employment.  
Vesco Ventilation & Equipment Sales
, 168 Ill. App. 3d at 964.  It is axiomatic that within this burden of proof there are two elements that must be shown.  Whether decedent sustained his heart attack in the course of his employment depends "upon the time, place and circumstance under which the accident occurred."  
Esco Corp. v. Industrial Comm'n
, 169 Ill. App. 3d 376, 382 (1988).  

In the context of heart attacks, an attack may be compensable even though the employee suffers the attack while away from work.  
Doyle v. Industrial Comm'n
, 86 Ill. 2d 544, 549 (1981).  The reason for this rule is that "a myocardial infarction may become manifest only hours after the physical or emotional stress that triggered it."  
Doyle
, 86 Ill. 2d at 549.  Here, despite decedent's attack occurring on his day off, it occurred within a reasonable time after work to be deemed in the course of employment.  Not only did decedent work the day before his attack, but symptoms of heart failure were manifest that day by way of chest pains.

As to the second element, whether decedent's heart attack arose out of his employment, claimant is required to prove that the heart attack was caused by some risk closely connected or incidental to the employment. 
 Esco Corp., 
169 Ill. App. 3d at 383.  "The risk of
 injury must be peculiar to the work such that the employee is exposed to it to a greater degree than the general public by reason of the employment."  
Esco Corp., 
169 Ill. App. 3d at 383.  Consequently, work-related emotional stress must be higher than normal for it to be a "risk" or a causative factor of the heart attack.  See 
Sears, Roebuck & Co.
 
v. Industrial Comm'n
, 79 Ill. 2d 59, 67 (1980); 
Esco Corp.
, 
169 Ill. App. 3d at 383; 
Vesco
 
Ventilation & Equipment Sales
, 168 Ill. App. 3d at 964.  To determine whether the emotional stress was "higher" than normal, Illinois courts have compared the employee's stress to that which all workers are subjected to occasionally.  
Esco Corp.
, 169 Ill. App. 3d at 383.  

While claimant must prove that some act of employment was a causative factor to establish that the heart attack arose out of decedent's employment, claimant need not show that it was the sole or even the principal causative factor.  
Ingersoll Milling Machine Co. v. Industrial Comm'n
, 253 Ill. App. 3d 462, 469 (1993).  To that end, a preexisting heart condition does not necessarily preclude compensation where the Commission "may legitimately infer from the evidence that the employee's work duties were a causative factor in the heart attack."  
Vesco Ventilation & Equipment Sales
, 168 Ill. App. 3d at 964.  Nevertheless, "[a]n injury would not be compensable if it was the result of a risk personal to the employee or resulted from a hazard to which the employee would have been equally exposed apart from the employment."  
Esco
 
Corp.
, 169 Ill. App. 3d at 383.   In the instant case, ample evidence supports the Commission's decision that work-related stress was not a causative factor leading to decedent's heart attack.  The manifest weight of the evidence shows that decedent was faced with normal working conditions when compared to employment in general.  Although claimant and Cunningham claimed decedent worked longer hours just prior to his death, other testimony indicated that he worked approximately nine hours per weekday and a few hours on Saturday.  This reflects that decedent maintained his normal nine hour work day during that period.  Additionally, the work performed on Saturdays was light and administrative in nature.  Although testimony showed that decedent succumbed to his heart attack during employer's busiest time of year, the "launch period," many workers in numerous settings also face "busy" periods that demand more time and effort as compared to other periods of the year.  Consequently, decedent's work load prior to his death falls within the range of reasonableness when compared to employees in general.  

Likewise, any stress associated with the buy-out of employer and the uncertainty of decedent's job security also cannot be a basis for linking his heart attack to his employment.  "Transfers, demotions, new responsibilities, and layoffs or terminations are normal and expected conditions of employment life, along with the accompanying insecurity and worry."  
Esco Corp.
, 169 Ill. App. 3d at 384.  See 
Martin
, 
227 Ill. App. 3d at 220.  Consequently, the fear and tension of losing a job is not sufficiently greater than that faced by workers in general to make the heart attack compensable.  
Esco Corp.
, 169 Ill. App. 3d at 384.              

The evidence also shows that decedent was under no more stress prior to his death than he was throughout his career with employer.  Ample testimony indicates that the hours decedent worked prior to his death were approximately the same as those he worked throughout his career.  Although the evidence shows that decedent was faced with the "launch period," the busiest time for employer, it also shows that this period arose each year and that the 1989 "launch period" was an easy one compared to those in the past.  Additionally, no evidence suggests that decedent was faced with burdensome deadlines or any particular projects other than the usual work associated with the launch period.  Also unremarkable was decedent's last day of work.  The record is devoid of evidence suggesting that decedent was confronted with any unusually strenuous or stressful occurrences.

Lastly, Dr. Smythe disagreed with Dr. Greenberg's opinion that prolonged, chronic stress to which decedent was allegedly subjected could have been a causative factor leading to his heart attack.  Although noting that acute stress has been linked as a factor leading to heart disease, Dr. Smythe testified that prolonged, chronic stress, on the other hand, has never been proven to be a contributing factor in coronary heart disease.  He further noted that if any stress was a factor in decedent's coronary disease, the stress associated with having two close family members diagnosed with terminal diseases would generally cause a more profound impact than anything decedent faced at the work place.  

Dr. Smythe observed that, although decedent had very few conditions that would lead to heart disease, he found two non-

stress related ones that could be instrumental.  Dr. Smythe suggested that decedent's obesity, though mild, still was a factor and that the death of decedent's father from a myocardial infarction was likely a major factor in causing decedent's heart attack.  Thus, considering this evidence in conjunction with the evidence showing that decedent's work-related stress was not unusual, sufficient evidence exists supporting the conclusion that decedent's work-related stress was not a causative factor leading to his heart attack.  As such, the Commission's decision is supported by the manifest weight of the evidence.

CONCLUSION

For the foregoing reasons, the confirmation of the Commission's decision by the circuit court of Cook County is affirmed.

Affirmed.

McCULLOUGH, P.J., and HUTCHINSON, HOLDRIDGE, and RARICK, JJ., concur.