(No. 90385

DARWIN BAGGETT, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Marion Community Unit School District No. 2, Appellee).

*Opinion filed March 15, 2002.—Rehearing denied August 29, 2002.*

Robert H. Howerton, of Howerton, Dorris, Stone & Phelps, of Marion, for appellant.

Nyhan, Pfister, Bambrick, Kinzie & Lowry, P.C., of Chicago (Harry E. Kinzie III and Bruce D. Crofts, of counsel), for appellee.

JUSTICE KILBRIDE delivered the opinion of the court:

This case requires us to examine the elements of proof necessary to establish a viable workers' compensation claim for a physical injury induced by job-related stress. Claimant, Darwin Baggett, filed a claim alleging that workplace stress caused him to suffer a heart attack, leading to extensive brain damage. While the arbitrator found in Baggett's favor, the Industrial Commission (Commission) rejected his claim. The circuit court of Williamson County then set aside the Commission's findings. The appellate court vacated the circuit court's order and reinstated the Commission's decision. No. 5—99—0053WC (unpublished order under Supreme Court Rule 23).

We allowed Baggett's petition for leave to appeal to determine whether the Commission erred by requiring Baggett (1) to prove that his injury occurred in the course of and arose out of his employment by showing (a) a greater degree of stress than coworkers, and (b) unusual and increased stress in the workplace at the time of injury; and (2) to prove a strict, scientific causal relationship between stress and the physical cause of injury. We find that the Commission erred. Accordingly, we reverse the judgment of the appellate court and affirm the circuit court's judgment.

## I. BACKGROUND

On March 13, 1990, Baggett, a high school industrial arts teacher for the Marion school district (District), collapsed at work. Baggett's collapse was caused by upper gastrointestinal tract bleeding, resulting in reduced blood volume. The reduced blood volume led to a myocardial

infarction, cardiac arrest, and resulting anoxic brain damage, rendering Baggett permanently and totally disabled. Baggett then filed a claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)).

On November 9, 1994, an arbitrator conducted a hearing on Baggett's claim. Fourteen witnesses testified on Baggett's behalf, including his wife, former students, fellow faculty members, and friends in the community. In general, those witnesses testified about Baggett's supervisory duties, other job demands, time deadlines, and the hazardous nature of the construction activities involving young students. Most of the witnesses confirmed that Baggett worked under stressful conditions and stated that they observed the effects of such stress upon Baggett.

A number of witnesses supported the District's contention that all teachers labored under varying degrees of stress. Witnesses also observed that Baggett was not working under any significantly different type of stress than other teachers and that there was no change of stress demonstrated at or near the time of the collapse. The District presented evidence that Baggett was a nervous person in general, that Baggett was involved in substantial nonschool activity contributing to his overall stress levels, and that he may have been more susceptible to mental stress than his coworkers.

Five doctors provided varying medical testimony as to whether stress caused Baggett's injury. Dr. Robert Morgan, Baggett's family physician, testified that Baggett suffered from a stomach disorder likely caused by stress. Dr. Clifford Talbert, Jr., a cardiovascular specialist, attended to Baggett at the hospital after Baggett's collapse. Dr. Talbert explained that Baggett's heart attack was caused by loss of blood resulting from a peptic ulcer. Dr. Wilfred Lee, a gastrointestinal specialist, also

examined Baggett after the collapse. Dr. Lee concluded that stress can be a causative factor of the bleeding but that the bleeding could have also been caused by other factors.

Dr. Ralph Graff, a specialist in gastrointestinal diseases and disorders, reviewed Baggett's medical records and the depositions of the other physicians, and indicated that Baggett's condition was more likely a result of an acute ulcer in the upper gastrointestinal area. Dr. Graff pointed out that in contrast to an acute ulcer, a chronic ulcer would leave scars. The records showed no chronic ulcer scars. Thus, Dr. Graff stated that he needed to know the precise location of the bleeding to find a causal connection between the stress and the bleeding.

Consistent with Dr. Graff's opinions, Dr. Virginia Weaver, a specialist in occupational medicine, testified that she could not find a causal connection between the stress and the bleeding condition. Dr. Weaver testified that the medical records did not conclusively indicate the precise location of the bleeding. Absent medical documentation of the precise location of the bleeding, the bleeding could have been caused by one of several factors. Dr. Weaver also stated that no scientific studies on a population basis showed a causal connection between stress and peptic ulcers.

Upon hearing the preceding evidence, the arbitrator found that Baggett's injuries arose out of, and were suffered in the course of, his employment. Additionally, the arbitrator determined that Baggett was entitled to benefits for permanent total disability and medical expenses.

The District rejected the arbitrator's decision and sought review by the Commission. On April 3, 1997, the Commission reversed the arbitrator's award, finding that Baggett failed to prove either that he sustained an ac-

cidental injury arising out of, and in the course of, his employment or that a causal relationship existed between the accident of March 13, 1990, and his medical condition of ill-being. Specifically, the Commission found as follows:

"The commission finds that [Baggett] failed to prove he was subjected to a greater degree of emotional strain than that to which all workers are occasionally subjected. The evidence presented by [Baggett] failed to show that [his] job provided unusual stress in general, and no increased stress around the time of his collapse, on March 13, 1990. Therefore, the Commission reverses the [d]ecision of the [a]rbitrator and finds that [Baggett] failed to prove an accident arising out of and in the course of [his] employment on March 13, 1990."

The Commission further found that:

"[Baggett] failed to prove that his present condition of ill-being is causally related to [his] alleged injury on March 13, 1990. The evidence presented by [Baggett] failed to show what the actual source of bleeding which presumably occurred in the upper gastrointestinal tract area was, or any scientific correlation between the stress and the gastrointestinal bleeding. Therefore, the commission reverses the [d]ecision of [a]rbitrator as to causal connection and finds that [Baggett] failed to prove that a causal connection exists between [the] alleged accident on March 13, 1990, and [his] present condition of ill-being."

Additionally, contrary to the express stipulation of the parties, the Commission found that Baggett was not permanently and totally disabled.

On December 13, 1998, upon judicial review, the circuit court set aside the Commission's order and adopted the arbitrator's conclusions, finding that the Commission's decision contradicted the manifest weight of the evidence. Specifically, the circuit court ruled that the Commission imposed improper standards of proof, requiring Baggett to introduce evidence relating to issues of increased and unusual stress, a scientific correlation

between stress and gastrointestinal bleeding, and the precise source of bleeding.

The appellate court then reversed the circuit court's judgment and reinstated the Commission's decision. In effect, the appellate court limited its inquiry to whether the medical testimony supported the Commission's determination. The appellate court failed to address whether the Commission used improper standards in reaching its decision. Two justices dissented and filed a statement that this case involves a substantial question warranting consideration by this court. 177 Ill. 2d R. 315(a).

We allowed Baggett's petition for leave to appeal to determine whether the Commission erred by requiring Baggett to (1) prove that his injury occurred in the course of and arose out of his employment by showing (a) a greater degree of stress than that experienced by coworkers, and (b) unusual and increased stress in the workplace at the time of injury; and (2) prove a strict, scientific causal relationship between stress and the physical cause of injury.

## II. ANALYSIS

As a threshold matter, the parties disagree as to the proper standard of review. Baggett argues that the Commission used improper legal standards to make its factual determinations, and therefore a *de novo* standard is appropriate. The District disagrees and argues that the Commission did not consider improper factors. Instead, the District contends that the Commission simply based its decision on Baggett's failure to prove a greater degree of emotional stress than experienced by the general public and a lack of proof of the causal connection between the bleeding and stress. Therefore, the District maintains that we should apply a deferential standard.

We agree with Baggett. Ordinarily, reviewing courts examine the Commission's factual findings under a

deferential standard. See *Saunders v. Industrial Comm'n*, 189 Ill. 2d 623 (2000) (addressing whether the Commission's decision contradicted the manifest weight of the evidence). Whether a claimant must prove certain elements to establish a compensable claim is purely a question of law and it is therefore reviewed *de novo*. See *P.R.S. International, Inc. v. Shred Pax Corp.*, 184 Ill. 2d 224, 234 (1998) (stating that legal questions are reviewed without deference). Thus, findings based on application of incorrect conclusions of law are not entitled to deference.

### A. The Element of an Injury in the Course of and Arising Out of Employment

To be compensable under the Act, the injury complained of must be one "arising out of and in the course of the employment." 820 ILCS 305/2 (West 1998). An injury "arises out of" one's employment if it originates from a risk connected with, or incidental to, the employment, involving a causal connection between the employment and the accidental injury. *Parro v. Industrial Comm'n*, 167 Ill. 2d 385, 393 (1995). An injury is sustained "in the course" of employment when it occurs during employment, at a place where the worker may reasonably perform employment duties, and while a worker fulfills those duties or engages in some incidental employment duties. *Parro*, 167 Ill. 2d at 393. Although the ultimate determination of those issues depends upon an assessment of the facts and circumstances of each particular case, that assessment must be made under our established legal standards. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38 (1987).

In determining whether the injury occurred in the course of, and arose out of, his employment, the District argues, Baggett must show that his employment presented a greater degree of stress than his coworkers experienced and that such stress reached an unusual and increased level at the time of his injury. We disagree.

The case at bar involves a physical injury allegedly induced by mental stress in the workplace. That sort of injury is one of three "mental injury" types of cases commonly described as a "mental-physical" injury. There are two other kinds of mental injury cases: "physical-mental" and "mental-mental" injuries. A "physical-mental" case involves a claim that physical stress is a causative factor of a mental injury. A "mental-mental" case involves a claim that mental stress is a causative factor of mental injury. 2 A. Larson, Worker's Compensation Law § 42.20 (2001).

In each category of mental cases, a claimant must be engaged in employment at the time and place of the precipitating cause of the injury. *Scheffler Greenhouses, Inc. v. Industrial Comm'n*, 66 Ill. 2d 361 (1977). A claimant must also prove that the injury occurred because of a work-connected risk or because the employment placed claimant at a risk of exposure exceeding that of the general public. *Orsini v. Industrial Comm'n*, 117 Ill. 2d at 45.

In *County of Cook v. Industrial Comm'n*, 69 Ill. 2d 10 (1977), this court examined the *Orsini* standard in a "mental-physical" context. We affirmed an award of compensation to the widow of a worker who died as a result of a heart attack. In part, we based our decision on an expert's medical opinion that the claimant's heart attack could have been caused by work-related stress during the final week of a claimant's employment. We observed:

> "An accidental injury can be found to have occurred, even though the result would not have obtained had the employee been in normal health. [Citation.] If an employee's existing physical structure gives way under the stress of his *usual labor*, his death is an accident which arises out of his employment. To come within the statute the employee need only prove that some act or phase of the employment was *a* causative factor of the resulting injury.

The mere fact that an employee might have suffered a fatal heart attack, even if not working, is immaterial, for the question before the Commission is whether the work that was performed constituted a causal factor. [Citation.] The *sole limitation* to the above general rule is that where it is shown the employee's health has so deteriorated that *any normal daily activity* is an overexertion, or where it is shown that the *activity engaged in presented risks no greater than those to which the general public is exposed*, compensation will be denied. [Citations.]'' (Emphases added.) *County of Cook*, 69 Ill. 2d at 17-18.

Similarly, in *Wirth v. Industrial Comm'n*, 57 Ill. 2d 475, 480-81 (1974), this court reversed the Commission's denial of benefits to the widow of a worker who died of a heart attack. The *Wirth* claim was supported by an expert's medical testimony that stress from the employment was a causative factor of the heart attack. The holding in *Wirth* was premised on a finding that the stress of the worker's *usual* labor may be shown to be a cause of an accident arising out of employment.

Hence, *County of Cook* and *Wirth* both focus on a usual labor standard in the workplace. Each case also confirms that the test for stress is whether working conditions expose the worker to risks greater than those facing the general public. *County of Cook* and *Wirth* do not require claimants to show stress greater than that of their coworkers, nor do those cases require increased and unusual levels of stress at the time of injury.

We stand behind our decisions in *County of Cook* and *Wirth* and decline to impose any new requirements. Under the District's rationale, a workforce as a whole could be uniformly and regularly subjected to outrageous working conditions of extreme stress and no single worker could sustain a claim for injury because all coworkers were subjected to the same extreme levels of stress. We refuse to extend *County of Cook* and *Wirth* to reach such a misguided conclusion.

We also disagree with the District's argument that

our decision in *Sears, Roebuck & Co. v. Industrial Comm'n*, 79 Ill. 2d 59 (1980), departed from the rules articulated in *Cook County* and *Wirth*. Citing *Vesco Ventilation & Equipment Sales v. Industrial Comm'n*, 168 Ill. App. 3d 959 (1988), *Esco Corp. v. Industrial Comm'n*, 169 Ill. App. 3d 376 (1988), and *Flynn v. Industrial Comm'n*, 302 Ill. App. 3d 695 (1998), the District relies on our observation in *Sears* that "[w]hen employment activities create a *higher than normal degree of stress*, and that stress contributes to the employee's death, the necessary causation is established." (Emphasis added.) *Sears*, 79 Ill. 2d at 67. We acknowledge that *Vesco*, *Esco*, and *Flynn* interpreted *Sears* as requiring that claimants show that they suffered a higher level of stress than their coworkers, and we hereby reject that interpretation.

The reference in *Sears* to "a higher than normal degree of stress" merely relates to normal stress levels experienced by the general public. *Sears*, 79 Ill. 2d at 67. That phrase refers neither to stress levels suffered by coworkers nor to an unusual or elevated level of stress at the moment of injury. This conclusion is evident because *Sears* specifically relied upon *Cook County* and *Wirth* and neither of those cases pronounced that a claimant's stress level must be compared to the level of stress of coworkers. Hence, we read *Sears* in concert with *Cook County* and *Wirth* as continuing the same requirement of proof of stress in the workplace as compared to stress experienced by the general public.

Here, our review of the record indicates that Baggett's injury arose out of, and in the course of, his employment. The record indicates that Baggett was under substantial stress at the time of his injury. The members of Baggett's building trades class were required to build houses under strict deadline pressures. Furthermore, prior to Baggett's injury, the District eliminated one-half

of the time he could spend with student workers. That change required Baggett to complete the houses while working half-days and with only one class instead of two. Then, the project was delayed for reasons beyond Baggett's control and it was as much as five weeks behind schedule.

The record further indicates that Baggett's students were inclined to horseplay and Baggett's disciplinary duties further interfered with completing the home constructions within the deadline. The record also indicated that Baggett's young students worked around scaffolding, power tools, and other hazardous construction conditions that intensified his responsibility to supervise them closely. The District also required Baggett to purchase materials for the project and ensure that they were delivered to the construction site. Under the approaching deadlines, Baggett became pale and tired. Baggett's wife testified that he complained of substantial stress and expressed his concerns about completing the project on time. She noticed his physical decline and noted that he complained of gastrointestinal pain. With those construction pressures looming, Baggett collapsed while at work.

We further conclude that Baggett's stress was different from the stress generally experienced by the public. Baggett's continuing stress over a period of time affected him cumulatively. The stress became more severe and its effects more noticeable to others as the project approached the completion deadline. Baggett's continuing stress might be compared with physical injuries occurring through repetitive physical work. Just as a repetitive, physical motion can cause a compensable injury (see *Peoria County Belwood Nursing Home v. Industrial Comm'n*, 115 Ill. 2d 524 (1987)), we find no reason to deny compensability for continuing, mental stress that leads to physical injury. Given the extensive pressures that Baggett was facing and, in particular, the strict

construction deadline, we conclude that Baggett's stress was different from the stress generally experienced by the public. See generally 2 A. Larson, Workers' Compensation Law § 44.05(4)(b) (2001) (noting that "[i]n the successful cases [proving that protracted mental stress lead to injury], there is also often to be found some emergency, crisis, case backlog, special deadline, unusually protracted negotiation, or work overload because of shortages of help").

We also reject the District's contention that Baggett should be denied recovery because he was overly susceptible to stress. The District argues that Baggett's family physician treated Baggett for headaches and anxiety throughout an approximate 20-year period. The District fails, however, to present a persuasive argument that Baggett's condition was so deteriorated that any daily activity would have caused his injury. Even if Baggett's susceptibility to stress had been particularly high, we would still reject the District's argument on this point. This court has always held that an employer must accept the employee as it finds the employee. *Rock Road Construction Co. v. Industrial Comm'n*, 37 Ill. 2d 123, 129 (1967); *County of Cook*, 69 Ill. 2d at 17. Further, for purposes of workers' compensation law, a critical distinction exists between the everyday stress of life accumulating to the point that any daily activity would have led to a specific injury and the everyday mental stress of a work environment accumulating to the point that any further work-related stress would lead to physical injury.

In sum, we hold that the Commission erred by requiring Baggett to establish that he was subjected to a greater degree of emotional strain than his coworkers. Baggett also should not have been required to prove that his job provided "unusual stress" or that his stress was increased around the time of his collapse. The Commission's finding that Baggett failed to prove an accident

arising out of, and in the course of, his employment was predicated on an erroneous legal conclusion and it must therefore be set aside.

### B. The Element of Causation

Baggett also argues that the Commission erred when it concluded that he failed to show the actual source of his bleeding and that he failed to show a scientific correlation between his work-related stress and his bleeding. In its order, the Commission stated:

"[Baggett] failed to prove that his present condition of ill-being is causally related to [his] alleged injury on March 13, 1990. The evidence presented by [Baggett] failed to show what the actual source of bleeding which presumably occurred in the upper gastrointestinal tract area was, or any scientific correlation between the stress and the gastrointestinal bleeding. Therefore, the commission reverses the [d]ecision of [the a]rbitrator as to causal connection and finds that [Baggett] failed to prove that a causal connection exists between [the] alleged accident on March 13, 1990, and [his] present condition of ill-being."

### 1. Actual Source of Bleeding

Baggett maintains that the Commission improperly required him to prove "the actual source" of his bleeding. Baggett contends that there is no dispute in this case that he suffered from a peptic ulcer. Further, according to Baggett, the Commission's use of the term "source" was synonymous with the term "location." Thus, in Baggett's view, the Commission required him to prove the precise, or exact, location of his ulcer in order to establish causation. Baggett asserts that the relevant issue in this case is simply whether the stress of his job was a causative factor of his bleeding ulcer and not the precise location of that ulcer. Thus, Baggett argues that the Commission "required [him] to prove what the law does not."

We agree with Baggett. If by using the phrase "source

of the bleeding" the Commission did indeed mean to require proof of the precise location of the ulcer, then the Commission has imposed an improper standard of proof. See *Williams v. Industrial Comm'n*, 85 Ill. 2d 117, 122 (1981). If, on the other hand, the Commission meant that Baggett failed to prove that the source of the bleeding was an ulcer, that finding is clearly against the manifest weight of the evidence. Neither Dr. Weaver nor Dr. Graf, who testified for the school district, opined that the bleeding was not caused by an ulcer. Dr. Weaver did speculate over alternative sources of Baggett's bleeding, such as gastritis or erosions in the stomach area, a tear of the esophagus or reflux-esophagitis. There was, however, no evidence in the record to indicate that Baggett experienced any of the conditions referred to by Dr. Weaver, except for a peptic ulcer.

Dr. Graf testified that Baggett's condition was more likely than not a result of an acute ulcer in the upper gastrointestinal area. He was unable to offer an opinion that stress caused the bleeding because he said he needed to know the precise location of the bleeding to make that determination. Likewise, Dr. Talbot and Dr. Lee, both of whom examined Baggett after his collapse, testified that Baggett suffered from a peptic ulcer. Dr. Talbot further opined that Baggett's heart attack was caused by loss of blood resulting from the ulcer. This testimony is sufficient to show that, more likely than not, Baggett had a peptic ulcer and it was the source of his bleeding.

### 2. Scientific Correlation

It is also unclear what the Commission meant when it stated that Baggett failed to show "any scientific correlation between the stress and the gastrointestinal bleeding." Baggett argues that the Commission used the term "scientific correlation" to describe a burden of proof. According to Baggett, the Commission required Baggett to prove scientifically and conclusively that stress

was a causative factor of his bleeding. Baggett maintains that "scientific" or "conclusive" proof is akin to proof beyond a reasonable doubt. Baggett further contends that the appropriate test in this case is not whether the evidence conclusively established that stress was a causative factor of his bleeding; instead, the test is whether it is more probably true than not true that on-the-job stress was a causative factor. We agree.

To receive benefits, Baggett is not required to provide "conclusive" proof that stress was a causative factor of his bleeding. Instead, Baggett must show that it is more probably true than not true that (1) he had an ulcer and (2) that this ulcer was aggravated by the stress of his employment. See, *e.g.*, *Johns-Mansville Products Corp. v. Industrial Comm'n*, 78 Ill. 2d 171, 177 (1979) ("Compensation will be awarded if the employee can show that the preexisting illness was aggravated or accelerated by the employment").

As noted above, the evidence of record in this case establishes that Baggett suffered from a peptic ulcer. The evidence further establishes that the stress of his employment aggravated this ulcer. Dr. Morgan treated Baggett for years for headaches and anxiety. In the autumn before his collapse, Baggett was treated for stress-induced stomach pain. Baggett's doctor prescribed an antispasmodic and a mild sedative. Baggett's physician continued treating him for similar complaints until his collapse at work. Baggett's gastroenterologist opined that stress might or could be a cause of ulcers and that a peptic ulcer is a common cause of upper gastrointestinal bleeding. Additionally, Baggett's wife testified that his stress levels increased while his physical health decreased as work-related pressures mounted. This evidence is sufficient to prove that Baggett's present condition of ill-being is causally related to his injury on March 13, 1990.

### III. CONCLUSION

The Commission's findings are erroneous as a matter

of law and must be set aside because the Commission required claimant to establish improper elements of proof. We hold that in a "mental-physical" injury case a claimant need not show stress exceeding the stress of coworkers. Rather, a claimant need only prove that the usual stress of the workplace is greater than the stress experienced by the general public. We further hold that a claimant need not prove increased or unusual stress at the time of the injury, nor must a claimant demonstrate a sole, strict, scientific correlation between stress and a physical injury. Finally, our review of the record indicates that Baggett's injury occurred in the course of, and arose out of, his employment and it was causally related to work-related stress. Baggett's injury caused permanent and total disability and he is entitled to benefits.

For those reasons, we reverse the appellate court judgment. Further, we affirm the circuit court judgment, reversing the Commission's order and reinstating the arbitrator's award of benefits to the claimant.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

### Dissenting Opinions Upon Denial of Rehearing

JUSTICE FITZGERALD, dissenting:

The Marion school district petitioned for rehearing in this case, arguing that, based on our decision in *Daniels v. Industrial Comm'n*, 201 Ill. 2d 160 (2002), it was entitled to a new Industrial Commission hearing because two of the commissioners that heard Baggett's claim—Kane and Reichart—were unlawfully appointed. In *Daniels*, a plurality opinion rendered just six days after the opinion in this case, four members of this court agreed that the appointments of Commissioners Kane and Reichart did not comply with the provisions of the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1992)), and remanded the matter for a new hearing before a properly constituted panel of commissioners.

In accordance with my dissent in *Daniels*, I remain firm in my belief that the *de facto* officer doctrine should apply to all of the decisions rendered by Commissioners Kane and Reichart, and should apply equally to the *Daniels* and *Baggett* cases. Under the *de facto* officer doctrine, the acts of Kane and Reichart as commissioners are valid. *Daniels*, 201 Ill. 2d at 179 (Fitzgerald, J., dissenting). *However*, based upon the fact that this court has chosen to give Daniels a new hearing due to the now-unlawful appointments of Kane and Reichart, I can see no reason why this court should not at least consider the argument of the Marion school district that it, too, is entitled to a new hearing on the same ground. Accordingly, like Justice Thomas, I would allow the Marion school district's petition for rehearing.

JUSTICE THOMAS, also dissenting:

Less than three months ago, this court awarded employee Pervis Daniels a new Industrial commission hearing because two of the commissioners who heard his claim were appointed unlawfully. *Daniels v. Industrial Comm'n*, 201 Ill. 2d 160 (2002). As the *Daniels* plurality explained:

> "Where an administrative agency acts outside its specific statutory authority, as the Commission did when it appointed Kane and Reichart, it acts without jurisdiction. Its actions are void, a nullity from their inception. [Citation.] The appointment of Kane and Reichart therefore had no legal effect." *Daniels*, 201 Ill. 2d at 165.[1]

As it turns out, those same two commissioners also sat on the panel that rendered the decision in today's case. In its petition for rehearing, the employer in this case—

---

[1] I dissented in *Daniels* because I believed—and continue to believe—that Daniels waived consideration of whether Commissioners Kane and Reichart were lawfully appointed. See *Daniels*, 201 Ill. 2d at 182-86 (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.).

Marion Community School District No. 2—brings this fact to our attention and requests the identical relief that this court awarded employee Daniels—namely, an invalidation of the Commission's decision and a new hearing before a lawfully constituted panel. This should not have been a controversial request, for our entire common law system is premised on the irreducible principle that identically situated litigants must be treated alike. Remarkably, however, the same court that awarded Daniels a new hearing has rejected the District's request without comment.

What could possibly explain this court's disparate treatment of identically situated litigants? The answer is found in Justice McMorrow's special concurrence in *Daniels*. In that special concurrence, Justice McMorrow asserts that, although she agrees with the plurality's conclusion Kane and Reichart were appointed unlawfully, "[t]he decisions in which they participated are not void." *Daniels*, 201 Ill. 2d at 173 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing). Rather, because Kane and Reichart exercised the duties of office under the color of lawful appointment, "[t]he common law *de facto* officer doctrine operates to prevent invalidation of [their] decisions." *Daniels*, 201 Ill. 2d at 173 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing). To this extent, the special concurrence echoes Justice Fitzgerald's dissent. See *Daniels*, 201 Ill. 2d at 178-81 (Fitzgerald, J., dissenting). Unlike Justice Fitzgerald, however, the special concurrence then insists upon having it both ways. Indeed, after explaining why "the decisions rendered by Kane and Reichart may be afforded *de facto* validity," the special concurrence U-turns and declares that "the equities, on balance, militate against application of the *de facto* officer doctrine in the case at bar, to deny Daniels review by a properly

constituted panel of commissioners." *Daniels*, 201 Ill. 2d at 175-76 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing).

So what, exactly, are the "equities" that compel vacating a perfectly valid order of the Illinois Industrial Commission in Daniels'—and only Daniels'—case? The special concurrence explains:

> "The position I take in this opinion—permitting Daniels, but no others, to have a new hearing—strikes an equitable balance between the identified competing interests. By permitting the claimant who brought the illegal appointments to light to receive a new hearing, the incentive to discover and pursue such illegality is maintained. Once the matter has been litigated and decided by the courts, however, the public interest in uncovering and addressing illegality is served. At that juncture, the public interest in preserving the validity of a large multitude of commission decisions takes precedence. Public policy and competing public interests often require courts to draw equitable lines. That line is best drawn in this case by permitting Daniels a new hearing, but by applying the *de facto* officer doctrine to maintain the validity of the decisions rendered by the illegally composed commission in other cases." *Daniels*, 201 Ill. 2d at 176-77 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing).

Thus, despite concluding that the decisions rendered by Kane and Reichart are perfectly valid under the *de facto* officer doctrine, Justice McMorrow ultimately concludes that "[a]pplying the *de facto* doctrine to the plaintiff's case at bar *** would *** run counter to a competing public interest—uncovering illegal appointment procedures, thereby ensuring that administrative agencies comply with the statutory mandates which govern them." *Daniels*, 201 Ill. 2d at 175 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing).

This analysis is flawed in several respects. To begin with, according to the special concurrence, the interest

that is served by "permitting Daniels, but no others, to have a new hearing" is the public's interest in "having illegal actions uncovered, reported and addressed by the courts." *Daniels*, 201 Ill. 2d at 176 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing). But how is the public served by an arbitrary suspension of the *de facto* officer doctrine in a single case? To be sure, in *Daniels*, this court "uncovered" and "reported" the illegality of Kane and Reichart's appointments, but this court by no means "addressed" that illegality. Indeed, the denial of rehearing in today's case confirms that this court emphatically *refuses* to address it. Other than Pervis Daniels, no member of the public will benefit from this court's determination that Kane and Reichart were appointed unlawfully. From the public's perspective, Kane and Reichart might as well have been appointed lawfully, because all of their decisions but one are valid and enforceable. Just ask the District.

That said, the empty appeal to the "public interest" is by no means the only flaw in the special concurrence's analysis. Borrowing from the vocabulary of microeconomics, the special concurrence asserts that, by arbitrarily singling out Daniels for undeserved appellate relief, "the incentive to discover and pursue [unlawful office holding] is maintained." *Daniels*, 201 Ill. 2d at 176 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing). But is it? The District, of course, endeavored to pursue unlawful office holding and had the door slammed in its face. And this reveals the flaw in the special concurrence's theory of incentives. By dangling the prospect of undeserved appellate relief before the public, this court is inviting an indeterminate number of future litigants to pursue what, for all but one of them, will be an empty exercise. Consider the following hypothetical. The Chicago Tribune

runs a story bearing the headline, "Governor's appointment procedures called into question." The very next day, and in direct response to the special concurrence's invitation, 100 lawsuits are filed challenging the validity of the decisions rendered by the officers in question. Assuming the challenged decisions are *de facto* valid, only one of those litigants will receive undeserved relief. This means that 99 other litigants, all of whom invested a great deal of time, grief, and expense *at the invitation of this court,* will have done so in vain. Given this reality, the rational litigant would *not* file suit because, while bearing one hundred percent of the litigation's costs, he or she would stand only a one percent chance of reaping the litigation's benefit. Litigation is not a raffle, and appellate relief should not be a door prize.

For that matter, under the hypothetical facts set forth above, how will this court decide who the lucky recipient of undeserved appellate relief will be? Again, 100 lawsuits are filed on the same day. Presumably, those cases will take varying amounts of time to work their ways through the system. Will the door prize go to the first to have his or her challenge adjudicated by the trial court? Surely not, for this would punish litigants whose arguments are more complex or whose cases are assigned to backlogged courtrooms. The first case to be decided by appellate court? This presents the same inequities that arise in the trial court. The first petition for leave to appeal filed in this court? This is a possibility, but this court often passes on an issue several times before finally granting leave to appeal. The first petition for leave to appeal allowed by this court? Maybe, but again, what if the first petition allowed is not the first one filed? The answer, of course, is that there is no answer, because courts should not be in the business of singling out and conferring upon isolated litigants relief that the law clearly prohibits.

Finally, consider the additional incentives inspired by

singling out Daniels for undeserved appellate relief. As the special concurrence concedes, Daniels' challenge to Kane and Reichart's authority was procedurally defaulted "because Daniels failed to challenge the validity of the appointments before the Board." *Daniels*, 201 Ill. 2d at 177 (McMorrow, J., specially concurring, joined by Freeman, J.) (modified upon denial of rehearing). Even worse, as I pointed out in my *Daniels* dissent, Daniels also failed to challenge the validity of the appointments before the circuit court on administrative review. *Daniels*, 201 Ill. 2d at 182 (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.). And if that were not enough, by the time Daniels got around to raising the issue in the appellate court, the factual basis for his claim arose not from the record on appeal but from an affidavit from Daniels' counsel that was attached *without leave of court* as an appendix to Daniels' appellate court brief. *Daniels*, 201 Ill. 2d at 182 (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.). Thus, in singling out Daniels for unwarranted appellate relief, this court is rewarding Daniels not only for advancing a losing argument on appeal but also for procedurally defaulting that issue before two separate tribunals and for injecting into his case matters wholly outside the record. What type of incentive does this create?

The bottom line is that there are only two legitimate means of addressing the issue raised both by Daniels' appeal and the District's petition for rehearing. Either the decisions rendered by Kane and Reichart are *de facto* valid, in which case no one gets a new hearing, or those decisions are void, in which case everyone gets a new hearing. There is no middle ground, and in attempting to forge one, this court breaches its fundamental duty to ensure that the law is administered fairly and equally.

I would grant the District's petition for rehearing.

JUSTICES FITZGERALD and GARMAN join in this dissent.