# Illinois Official Reports

## Appellate Court

*Walker Brothers, Inc. v. Illinois Workers' Compensation Comm'n*,
2019 IL App (1st) 181519WC

| | |
|---|---|
| Appellate Court Caption | WALKER BROTHERS, INC., Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Clarette Ramsey, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division No. 1-18-1519WC |
| Filed Rehearing denied | September 13, 2019 September 18, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-L-51020; the Hon. James M. McGing, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Glenn A. Blackmon and Jaclyn D. Jednachowski, of Rusin & Maciorowski, Ltd., of Chicago, for appellant. |
| | Adam T. Karchmar, of Karchmar & Stone, of Chicago, for appellee. |

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices Hoffman, Hudson, Cavanagh, and Barberis concurred in the judgment and opinion.

## OPINION

¶ 1    The employer, Walker Brothers, Inc., appeals an order of the circuit court of Cook County confirming a decision of the Illinois Workers' Compensation Commission (Commission) awarding the claimant, Clarette Ramsey, medical, temporary total disability (TTD), and permanent partial disability (PPD) benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2016)).

¶ 2                                      FACTS

¶ 3    The following factual recitation is taken from the evidence presented at the arbitration hearing on November 19, 2015, and the Commission's decision dated November 9, 2017.

¶ 4    The claimant testified that he had worked for the employer as a cook since 1978. On February 13, 2013, at around 5:50 a.m., he parked in the Ace Hardware (Ace) parking lot near the employer's restaurant and waited for another worker to arrive before exiting his car because he did not have a key to unlock the restaurant doors. The claimant explained that he parked at the Ace parking lot because "[t]hat's where they give us permission to park." Further, the claimant testified that the employer's supervisors posted a note in the employee break room stating, "we can only park at Ace but not between Thanksgiving and Christmas, park on the street." However, there were no signs in the Ace parking lot reserving parking spots for the employer's employees. The claimant then saw Jesus Salanas, a colleague, arrive and walk toward the restaurant. At that time, the claimant exited his vehicle and rushed to follow him because the employer had a policy of disciplining employees who clocked in even two minutes late. The claimant slipped and fell on Ace's snowy and icy parking lot surface. He recalled that he screamed and Salanas came back to attend to him and help him locate his cell phone.

¶ 5    The claimant testified that he felt pain in his shoulder, hip, and back after his fall. He reported the accident to his manager and went to the emergency room for treatment. Medical records indicated that he complained of left hip and left shoulder pain from slipping on ice and denied back pain. X-rays of the claimant's hip and shoulder were negative for fractures and dislocations, but he was diagnosed with left hip and left shoulder contusions and was instructed for follow-up treatment. The emergency room report stated that the claimant reported that the accident was not witnessed. The claimant also saw his primary care provider, Dr. Jonathan Littman, who diagnosed him with contusions on the left shoulder and left hip. He prescribed the claimant pain medication and instructed him not to work from February 15, 2013, to February 19, 2013. The claimant visited Dr. Littman again in March and was referred to physical therapy.

¶ 6    In April 2013, the claimant was referred to Dr. Gregory Dairyko, an orthopedic surgeon, who ordered spine, hip, pelvis, and shoulder X-rays. The X-rays revealed evidence of arthritis in the lumbar spine and mild degenerative changes in the left shoulder. The claimant reported 10/10 pain and Dr. Dairyko administered a cortisone injection to the claimant's left shoulder. Dr. Dairyko ordered the claimant to continue physical therapy but believed that surgery may

become necessary. A month later, the claimant reported continued pain. Dr. Dairyko recommended an MRI of the left shoulder. The MRI showed that the claimant suffered from tendinosis, a partial thickness tear in the distal insertion, and marked degenerative hypertrophic changes in the acromioclavicular (AC) joint. Dr. Dairyko noted that the claimant had aggravated preexisting AC joint arthritis due to the February 13, 2013, fall. Based on these positive findings and the failed physical therapy and cortisone injection, Dr. Dairyko recommended surgery.

¶ 7        On August 14, 2013, the claimant underwent a left should arthroscopy, subacromial decompression, distal clavicle excision, limited debridement, and rotator cuff repair. The claimant's postoperative diagnosis was a left shoulder rotator cuff tear and left shoulder AC joint arthritis. Following this surgery, the claimant continued physical therapy and followed up with Dr. Dairyko. The claimant testified that he stopped working for the employer after his surgery and did not return to work until November 4, 2013, when Dr. Dairyko allowed him to work with restrictions of no pulling, pushing, or lifting greater that five pounds with the left arm. The claimant returned to work on November 5, 2013, and the employer honored his restrictions. Dr. Dairyko released the claimant to full duty work as of November 25, 2013. In November 2013, Dr. Dairyko's last treatment note indicated that there were some improvements in the claimant's left shoulder, but some pain continued. The claimant's last physical therapy note from December 2013 noted similar progress. The claimant stated that he was subsequently terminated from his employment because he was unable to perform his job functions. It is undisputed that the claimant's average weekly wage was $576.10 while he worked for the employer.

¶ 8        At the time of the arbitration hearing, the claimant was 63 years old. He had difficulty sleeping on his left shoulder and hip, difficulty raising items with his left shoulder, and back pain with extended sitting. He stated that he was not seeking treatment for his back and hip pain but instead was managing his pain with medications.

¶ 9        Dr. Kevin Walsh testified by deposition that he conducted an examination of the claimant by the employer's request on December 17, 2013. He reviewed the claimant's medical records, including the initial emergency room records, treatment with Drs. Littman and Dairyko, and physical therapy records. Dr. Walsh opined that the claimant suffered a contusion to the shoulder as a result of his fall. He concluded that the claimant did not suffer a rotator cuff tear and that the rotator cuff tear described by Dr. Dairyko was more likely than not degenerative in origin and "quite small," measuring only a few millimeters. Dr. Walsh concluded, that while it was reasonable for the claimant to be evaluated in the emergency room and seek treatment from his primary care provider and an orthopedic surgeon, the need for arthroscopic intervention was not clearly established in the claimant's medical records. Thus, he opined that the claimant did not require additional treatment and did not require any work restrictions.

¶ 10        Dr. Guido Marra testified by deposition that he conducted an examination of the claimant by the claimant's request on April 8, 2014. He testified that he reviewed the claimant's May 2013 MRI and agreed that it showed a small rotator cuff with arthritic changes in the AC joint and anterior acromial spurring. Dr. Marra stated that he could not say whether the rotator cuff was caused by the accident but opined that the claimant's left shoulder condition was causally related to the alleged accident and his treatment was reasonable and necessary. He opined that his causation opinion was based on the claimant not having shoulder pain prior to the accident and subsequently complaining of pain after the accident.

¶ 11      Salanas, the claimant's colleague, testified that he worked for the employer for about 15 years at the time of the claimant's accident. Salanas stated that he saw the claimant in his car on the morning of February 13, 2013, but he did not see him fall or see him on the ground. Salanas stated that the employees were not allowed to park in the employer's parking lot because it was too small. Salanas normally parked in either the Ace parking lot, which was a two or three minute walk from the employer's restaurant, or on a side street. Salanas stated that the employees were not required to park in the Ace parking lot and that most employees park on side streets because parking at Ace requires them to cross a street to reach work. Additionally, some employees parked in the Subway sandwich shop parking lot. Salanas explained that the employer's employees were only allowed to use a certain part of the Ace parking lot and that they were not allowed to park there during November and December.

¶ 12      Kevin Donoghue, the director of human resources for the employer, testified that the employer had no designated employee parking lot. Further, pursuant to an "informal agreement with Ace," some employees parked in the Ace parking lot "across the street and down half a block." However, the employer did not pay Ace for use or maintenance of the lot. Donoghue testified that the employer's employees were allowed to use only the section of parking spots furthest away from Ace's entryway and that the employees do not receive any priority over Ace customers. Donoghue explained that the employer's employees have other options for parking, such as side street parking that requires no payment or permit, and that not all of the employer's employees park in Ace's parking lot. Donoghue said that the arrangement with Ace alleviated complaints resulting from the employees' cars crowding a side street (not the side street the employees were directed to park on) or a nearby store. Additionally, Donoghue stated that a sign was posted in the employer's restaurant stating that employees were not allowed to park in the employer's lot or next door at the ski shop but that parking was available at Ace.

¶ 13      Donoghue also stated that the claimant was terminated on January 15, 2015, for several reasons, including performance issues, insubordination, harassment, and making threats to the general manager. Donoghue explained that the claimant had significant performance issues on several occasions prior to the February 13, 2013, accident, which required disciplinary action to be taken. These problems included keeping up, difficulty with good quality, trouble working in a fast-paced environment, and making mistakes. For example, the claimant was disciplined on November 11, 2012, for suspicion of being under the influence of alcohol or a drug. Donoghue concluded that the claimant was not meeting the employer's standards, he was not cooking food, and he left the kitchen while orders were being called out.

¶ 14      John Weiss, the owner of the Ace store and parking lot located near the employer's restaurant, also testified by deposition. He estimated that the distance between his store and the employer's restaurant was one to two blocks and a two to three minute walk. Weiss stated that the employer's employees were allowed to park in his lot, but he said that the arrangement was so longstanding he could not remember exactly how it originally came about but believed a manager from the employer's restaurant approached him and asked if their employees could park in his parking lot. Weiss stated that he allows the employer's employees to use the lot free of charge, as a courtesy, so long as there is no special event occurring in the parking lot. He explained that there were 13 spaces in his parking lot that the employer's employees could use but noted that the general public is also allowed to use those spots. Weiss stated that he alone paid for snow removal and maintenance costs for the parking lot.

¶ 15 On December 31, 2015, the arbitrator denied the claimant's request for benefits finding that he failed to prove that he sustained an accident that arose out of and in the course of his employment with the employer. The claimant sought review by the Commission.

¶ 16 On November 9, 2017, the Commission reversed the decision of the arbitrator and ordered the employer to pay the claimant TTD benefits of $384.07 per week for $12^4/_7$ weeks, PPD benefits of $345.66 per week for a period of 62.5 weeks, and all reasonable and necessary medical expenses as described by Dr. Marra. The Commission found that the employer provided the Ace parking lot to its employees and the claimant's accident was compensable.

¶ 17 The employer sought review of the Commission's decision before the circuit court of Cook County. The court confirmed the Commission's decision. The employer appeals.

¶ 18                                                  ANALYSIS

¶ 19 The employer takes issue with the following determinations made by the Commission: (1) the claimant's injury arose out of and in the course of his employment with the employer, (2) the claimant proved causation between his condition of ill-being and his employment, and (3) the claimant was entitled to medical, TTD, PPD benefits. The claimant argues that the Commission's determinations were proper.

¶ 20 To obtain compensation under the Act, a claimant must show, by a preponderance of the evidence, that he suffered a disabling injury that arose out of and in the course of his employment. *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 194 (2002). An injury "arises out of" one's employment if it originated from a risk connected with, or incidental to, the employment and involved a causal connection between the employment and the accidental injury. *Id.* "In the course of" refers to the time, place, and circumstances of the accident. *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 483 (1989). Both elements must be present at the time of the claimant's injury to justify compensation under the Act. *Id.* Usually, whether the claimant proved these elements is a question of fact for the Commission to resolve, and that determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Joiner v. Industrial Comm'n*, 337 Ill. App. 3d 812, 815 (2003). However, whereas here, the facts are undisputed and susceptible to only a single inference, the question is one of law and subject to *de novo* review. *Id.*; see *Diaz v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120294WC, ¶ 21 (when there is no question of inference or weight to be given to evidence because all the Commission did was apply the law to the undisputed facts our review is *de novo*). We note that both parties agree that our standard of review is *de novo*.

¶ 21 Generally, "when an employee slips and falls at a point off the employer's premises while traveling to or from work, the resulting injuries do not arise out of and in the course of the employment and are not compensable under the Act." *Joiner*, 337 Ill. App. 3d at 815. This is known as the "general premises rule." However, our supreme court has carved out an exception to this rule when an employer "provides" a parking lot to its employees. *De Hoyos v. Industrial Comm'n*, 26 Ill. 2d 110, 113 (1962). In *De Hoyos*, the claimant testified that he slipped and fell while he was on his employer's parking lot. *Id.* On cross-examination, the claimant stated that he did not actually know who owned the parking lot, but his employer provided the parking lot to its employees, he had parked there during the past 12 years, and it was adjacent to the employer's plant. *Id.* The supreme court outlined the "parking lot exception" and explained:

"Whether or not the employer owned the parking lot is immaterial; for if the employer provides a parking lot which is customarily used by its employees, the employer is responsible for the maintenance and control of that parking lot. Therefore, the question presented to the circuit court was not one of disputed fact or whether the decision of the Industrial Commission was manifestly against the weight of the evidence, but whether, when an employer provides a parking lot for employees and an employee falls on the parking lot, this fact being uncontroverted on the record, the employee is entitled to recover as a matter of law." *Id.* at 113-14.

¶ 22    In sum, *De Hoyos* stands for the proposition that if an employer provides a lot to its employees, and an employee is injured on that lot, the employee is entitled to recover under the Act. *Id.* However, this parking lot exception has been narrowed since its inception. Just four years after *De Hoyos*, our supreme court stated, "[t]he decisive issue in parking lot cases usually is whether or not the lot is owned by the employer, or controlled by the employer, or is a route required by the employer." *Maxim's of Illinois, Inc. v. Industrial Comm'n*, 35 Ill. 2d 601, 604 (1966). The employer's control or dominion over the parking lot is a significant factor in the analysis. *Joiner*, 337 Ill. App. 3d at 816. Our supreme court has also recognized that "[r]ecovery has *** been permitted for injuries sustained by an employee in a parking lot provided by *and* under the control of an employer." (Emphasis added.) *Illinois Bell*, 131 Ill. 2d at 484.

¶ 23    In determining whether the parking lot exception applies, it is clear that we must determine whether the employer "provided" the parking lot in question to its employees. We make this determination by considering (1) whether the parking lot was owned by the employer, (2) whether the employer exercised control or dominion over the parking lot, and (3) whether the parking lot was a route required by the employer.

¶ 24    The uncontroverted evidence established that the employer had a longstanding agreement with the owner of Ace, where Ace allowed the employer's employees to park in 13 specific parking spaces January through October. Those parking spaces were also open to the general public and there were no signs indicating that the spots were reserved for the employer's employees. It is undisputed that the employer did not own the Ace parking lot. Additionally, the evidence also showed that the employer did not control the parking lot. Weiss testified regarding his parking guidelines the employer's employees were required to follow in order to continue using the parking lot. It is also undisputed that Weiss paid for the maintenance of the Ace parking lot and the employer did nothing to contribute to the maintenance of the parking lot. There is no evidence of record that the employer controlled the Ace parking lot in any way.

¶ 25    Last, the evidence demonstrated that the Ace parking lot was not part of a route required by the employer. Although the claimant testified that he was required to park in the Ace parking lot, there was no evidence to support this contention. Instead, the record contained evidence of the contrary. For instance, Salanas, the claimant's coworker, stated that the employees were not required to park in the Ace parking lot and that most employees park on side streets. The evidence also showed that the Ace parking lot was not part of a route *required* by the employer. Donoghue, the director of human resources for the employer, testified that the Ace parking lot was "across the street and down half a block." Also, Weiss estimated that the distance between the Ace store and the employer's restaurant was one to two blocks and a two to three minute walk. Salanas also stated that most employees park on the side street because parking at the Ace parking lot required crossing the street. Additionally, the Ace parking lot was not part of

- 6 -

a required route as the employer communicated various other optional parking solutions, such as side street parking or other establishments' parking lots.

¶ 26 In conclusion, the claimant was injured in a parking lot that was not provided by the employer as the employer did not own the Ace parking lot, control the Ace parking lot, nor did it require its employees to park or travel through the Ace parking lot for their employment. Thus, the injuries suffered by the claimant did not arise out of or in the course of his employment with the employer. Based on our conclusion, we need not address the employer's other arguments.

¶ 27 CONCLUSION

¶ 28 For the foregoing reasons, the Commission's finding that the claimant sustained accidental injuries arising out of and in the course of his employment with the employer on February 13, 2013, was erroneous as a matter of law, and we reverse the judgment of the circuit court confirming the Commission's decision.

¶ 29 Reversed.